UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

APPLIED FILTER TECHNOLOGY, INC., a Washington Corporation,

        Plaintiff,

vs.

JEFF WETZEL, individually, and the marital community of JEFF WETZEL and JANE DOE WETZEL; ENVIRONMENTAL SYSTEMS AND COMPOSITES, INC., a Washington Corporation,

        Defendants.

Case No. C09-1040JLR

**DECLARATION OF PAUL TOWER IN SUPPORT OF PLAINTIFF'S INJUNCTION MOTIONS**

I, Paul Tower, declare that:

1. I am the owner of Applied Filter Technology, Inc., ("AFT") a Washington Corporation formed initially in 1996 and incorporated in 2000. AFT is located in Snohomish County, Washington.

2. AFT is engaged in the business of providing products, systems, and support to local utility companies and others for the purpose of purifying biogas from anaerobic digesters and landfills by removing contaminants, such as siloxanes, from the fuel gas so that it can be

TOWER DEC. ISO INJUNCTION -1-
C:\Documents and Settings\pault\Local Settings\Temporary Internet Files\Content.Outlook\ESD6E867\0007 shr tower dec iso motion for tro (2).doc

Parsons Farnell & Grein, LLP
Attorneys at Law
1030 SW Morrison Street, Portland, OR 97205
Telephone: (503) 222-1812 / Fax: (503) 274-7979

burned without damage to engines. One of the defendants in this matter, Jeff Wetzel, is a former full-time consultant to AFT. Defendant Environmental Systems and Composites, Inc. ("ESC") is a competitor of AFT's, owned and run by another former consultant to AFT.

3.   Wetzel began working for AFT in approximately 1996, part time, as a consultant. In 2003, in exchange for a higher rate of compensation and more work, and access to more of AFT's proprietary information, Wetzel executed a Confidentiality and Non-Disclosure Agreement ("NDA") with AFT. A true and correct copy of the NDA is attached here to as Exhibit A. One purpose of the NDA was to permit Wetzel to have greater access to AFT's proprietary, confidential and trade secret information. That information includes AFT's filtration techniques and products, gas testing techniques (which was the primary focus of Wetzel's work), and its customer and supplier information.

4.   AFT has developed unique proprietary technology for siloxane removal (and removal of other contaminants) from fuel gases including the following: $SAG^{TM}$, $SAGPack^{TM}$, $SULFRPack^{TM}$, $SulfrStrip^{TM}$, $HOX^{TM}$, and $SWOP^{TM}$ processes. A key component of the proprietary technology developed by AFT is the chemical components of the filter media that AFT uses in its systems. Such information derives its value from not being commonly known or publicly available, and AFT has taken steps to keep such information confidential. AFT has developed some of these chemical components in partnership with others, and in at least one instance has an exclusive license arrangement with a component manufacturer.

5.   AFT has also developed unique and proprietary methods and techniques for biogas analysis, by modifying standard tests developed by, among others, ASTM, for greater accuracy and other purposes. Such information derives its value from not being commonly known or publicly available, and AFT has taken steps to keep such information confidential.

TOWER DEC. ISO INJUNCTION -2-
C:\Documents and Settings\paul\Local Settings\Temporary Internet Files\Content.Outlook\ESD6E867\0007 shr tower dec iso motion for tro (2).doc

Parsons Farnell & Grein, LLP
Attorneys at Law
1030 SW Morrison Street, Portland, OR 97205
Telephone: (503) 222-1812 / Fax: (503) 274-7979

6. In the course of building its business, AFT has developed and cultivated relationships with customers and potential customers, including information about and personal contacts within, industries that serve as gateways to potential customers, and information about potential customers. Such information derives its value from not being commonly known or publicly available, and AFT has taken steps to keep such information confidential.

7. AFT has also developed a network of suppliers, including suppliers of equipment, filter media, chemicals, and services. Some of these entities supply products or items that are specifically produced for AFT or to AFT's specifications under confidentiality agreements between the entity and AFT. Such information derives its value from not being commonly known or publicly available, and AFT has taken steps to keep such information confidential.

8. AFT has expended in excess of $5,000,000 to develop its proprietary, confidential, and trade secret products, processes, designs, and techniques as well as its confidential and trade secret information relating to customers and suppliers.

9. The expense and effort expended by AFT in developing its proprietary, confidential, and trade secret products, processes, designs, and techniques has resulted in AFT becoming one of the most successful companies in its field and its products and processes becoming a standard against which other competitors are judged by potential customers.

10. In addition, AFT's commitment to its warranties, its commitment to providing service to its customers beyond its warranty obligations, the uniqueness of its products, and the reliability of its technology have earned it considerable goodwill among its customers and potential customers.

11. The industry in which AFT competes is highly competitive. Competition is

TOWER DEC. ISO INJUNCTION -3-
C:\Documents and Settings\pault\Local Settings\Temporary Internet Files\Content.Outlook\ESD6E867\0007 shr tower dec iso motion for tro (2).doc

Parsons Farnell & Grein, LLP
Attorneys at Law
1030 SW Morrison Street, Portland, OR 97205
Telephone: (503) 222-1812 / Fax: (503) 274-7979

generally based both on quality and dependability, and also price and support.

12. Prior to 2007, ESC had not competed actively with AFT in the biogas purification segment of the filtration market. In or about 2007, ESC began advertising products and services related to biogas.

13. About the same time, I began to suspect that Wetzel was providing AFT confidential information to ESC to enable ESC to compete in the biogas purification market. AFT hired legal counsel to, among other things, try to determine if Wetzel was doing so, and AFT (through counsel) contacted ESC about the matter. In response ESC removed certain items from its website. AFT also began to attempt to limit Wetzel's access to AFT's computer systems. However, AFT was unable to substantiate its suspicions about Wetzel and ESC.

14. Since 2007, ESC has been the successful bidder or applicant, on projects that were not publicly known, but which were known to Wetzel as a result of his work for AFT. The manner in which ESC competed for these projects, including the proposals made by ESC and the timing of those proposals, indicated to me that ESC was using confidential information provided by Wetzel that he learned through his work for AFT, including confidential information about the projects themselves. Specifically, the potential projects on which ESC was competing were not public knowledge; the existence of those potential projects was, however, known to AFT because of its investment in a network of sales people and relationships with potential customers (including the consulting engineers who put together the design specifications for the projects on behalf of the owners). Wetzel had access to that confidential information as a result of his work for AFT. In addition, some of the processes being advertised by ESC were identical, in description, to AFT's processes.

15. In early June, 2009, Wetzel terminated his contracting relationship with AFT. I

TOWER DEC. ISO INJUNCTION -4-
C:\Documents and Settings\pault\Local Settings\Temporary Internet Files\Content.Outlook\ESD6E867\0007 shr tower dec iso motion for tro (2).doc

Parsons Farnell & Grein, LLP
Attorneys at Law
1030 SW Morrison Street, Portland, OR 97205
Telephone: (503) 222-1812 / Fax: (503) 274-7979

knew and understood that Wetzel had downloaded information from AFT's computer systems to portable hard drive storage devices that he owned, for the ostensible purpose of working on AFT business at home. Pursuant to the terms of the NDA, I sent an email to Wetzel demanding the return of AFT's confidential information. Wetzel did not comply with that request nor did he comply with a subsequent request (through my counsel, John Parsons of Parsons Farnell & Grein LLP) that he return the information.

16. Since Wetzel terminated his relationship with AFT, I have been informed that Wetzel, on behalf of ESC, and ESC and its agents, have represented to customers and potential customers of AFT and ESC that ESC's technology relating to biogas purification is "the same" as AFT's, that ESC "has" AFT's technology, that ESC "split off" from AFT and possesses the same technology, and that ESC "stole" Wetzel and his know-how away from AFT. In addition, since Wetzel terminated his relationship with AFT, ESC or its agents have attempted to be considered for two projects – one in Richmond, California and one at "Ina Road" in Tucson, Arizona – that were not publicly known but were known to Wetzel through his access to confidential information from AFT.

17. Moreover, Wetzel has, in the last few weeks and by phone as recently as June 22, 2009, contacted a supplier to AFT who makes a proprietary chemical compound used exclusively, under license, by AFT in one of its unique, proprietary filtration processes. Wetzel made inquiries about obtaining the supplier's proprietary chemical compound and information about how to use the chemical (including pressurization information) indicating that the process he intended to use the chemical in is AFT's proprietary filtration process. Wetzel additionally indicated that he was seeking this information for the Richmond, California and Ina Road projects.

TOWER DEC. ISO INJUNCTION -5-
C:\Documents and Settings\pault\Local Settings\Temporary Internet Files\Content.Outlook\ESD6E867\0007 shr tower dec iso motion for tro (2).doc

Parsons Farnell & Grein, LLP
Attorneys at Law
1030 SW Morrison Street, Portland, OR 97205
Telephone: (503) 222-1812 / Fax: (503) 274-7979

18. In general terms, the projects for which AFT and ESC compete proceed as follows: the potential customer (often a local utility), commissions an analysis of its biogas problem using AFT or one of its competitors, and from that analysis determines what types of products or services are necessary to mitigate the problem; the potential customer retains a consulting engineer who compiles a bid specification packet, including specifications for the purification processes that it is believed will accomplish the customer's goal; the project is then put out to bid to construction companies to construct the facility – those construction companies are constrained in the purification processes that they can choose from by the specifications included in the bid packet. Generally speaking, ESC and AFT compete to be included in the specifications packet, meaning that ESC and AFT's potential customer is both the owner (the utility) and the consulting engineer who is assembling the bid packet.

19. The Richmond, California project went to "bid" on Tuesday, July 21, 2009. The Ina Road project will go to bid at the end of July, 2009.

20. One of AFT's most valuable assets is the goodwill that it has generated by providing unique, proprietary, and superior processes for filtration of biogas. I strongly believe that if ESC is permitted to participate in the Ina Road bidding project using the information and processes that it apparently intends to use – which constitute confidential and proprietary information owned by AFT, and are subject to the NDA – the goodwill that AFT has developed will be immediately damaged in a manner difficult or incapable of quantification in monetary terms. Furthermore, another of AFT's goodwill assets is its relationships with its suppliers. The biogas filtration industry is small, and like many such industries "word" gets around quickly of a company's problems with protecting is intellectual property and relationships, to both suppliers and potential customers. AFT strongly believes that if ESC is not immediately restrained from

TOWER DEC. ISO INJUNCTION -6-

C:\Documents and Settings\pault\Local Settings\Temporary Internet Files\Content.Outlook\ESD6E867\0007 shr tower dec iso motion for tro (2).doc

Parsons Farnell & Grein, LLP
Attorneys at Law
1030 SW Morrison Street, Portland, OR 97205
Telephone: (503) 222-1812 / Fax: (503) 274-7979

1 | continuing to represent that it has AFT technology and attempting to obtain information from

2 | ///

3 | ///

4 | ///

5 | ///

6 | AFT's suppliers, AFT's goodwill will be immediately and irreparably damaged.

8 | DATED this 23th day of July, 2009.

9 | I declare under penalty of perjury that the foregoing is true and correct to the best of

10 | my knowledge.

*/s/ Paul Tower*

Paul Tower

TOWER DEC. ISO INJUNCTION -7-
C:\Documents and Settings\pault\Local Settings\Temporary Internet Files\Content.Outlook\ESD6E867\0007 shr tower dec iso motion for tro (2).doc

Parsons Farnell & Grein, LLP
Attorneys at Law
1030 SW Morrison Street, Portland, OR 97205
Telephone: (503) 222-1812 / Fax: (503) 274-7979

# CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT

THIS CONFIDENTILAITY AND NON-DISCLOSURE AGREEMENT ("AGREEMENT") is entered into as of August 1, 2003, by and between Applied Filter Technology, Inc., a Washington corporation, having offices located at 19524 75th Avenue. S.E, Snohomish, WA 98296 (hereinafter called "AFT") and Jeff Wetzel (hereinafter called "Employee"). (AFT and Employee may be hereinafter referred to jointly as the "PARTIES" or singularly as a "PARTY"). AFT is interested in sharing and developing CONFIDENTIAL INFORMATION with the Employee which might lead to comprehensive investments, patents, or other agreements in or by AFT for the purpose of advancing sales of SAG Filtration Technology in landfill, digester and other methane applications. The CONFIDENTIAL INFORMATION exchanged, to be exchanged or developed under the employment of the Employee may include but is not limited to, proprietary information including access to formulae, engineering, inventions, processes, costs and prospective project or opportunity locations, customer and related information concerning the business affairs, marketing strategies and operations of AFT.

IN CONSIDERATION OF the mutual covenants hereinafter set forth and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the PARTIES hereby agree as follows:

1. The term "CONFIDENTIAL INFORMATION" means all technical and nontechnical information of DISCLOSER, as defined below, including but without limitation: all information provided in confidence, the substance or identification, which relates to product and business plans, research, engineering, development, marketing, distribution, technical processes and formulas, product designs, sales, costs, and other unpublished financial information, revenues, usage rates, projections and marketing data, ideas, copyrights, know-how, and trade secrets, whether such information is disclosed to RECIPIENT through a written or oral communication, or is received by observation. The PARTIES acknowledge and agree that CONFIDENTIAL INFORMATION does not include any information which: (A) has been made public other than by acts of the RECIPIENT or its representatives (REPRESENTATIVES, as defined below) in violation of this AGREEMENT, (B) becomes available to RECIPIENT on a non-confidential basis prior to its disclosure by or on behalf of the DISCLOSER, or (C) becomes available to the RECIPIENT from a source not known to the RECIPIENT or its REPRESENTATIVES to be prohibited from transmitting the CONFIDENTIAL INFORMATION to the RECIPIENT.

2. For the purposes of this AGREEMENT, "DISCLOSER" shall mean the PARTY disclosing the CONFIDENTIAL INFORMATION and "RECIPIENT" shall mean the PARTY receiving the CONFIDENTIAL INFORMATION from DISCLOSER

3. RECIPIENT recognizes and acknowledges that CONFIDENTIAL INFORMATION has substantial value for commercial exploitation as well as a competitive value and that this CONFIDENTIAL INFORMATION must be protected as both proprietary and confidential in order to protect the DISCLOSER's business and strategic interests, and that damage could result to DISCLOSER if any of the CONFIDENTIAL INFORMATION is disclosed to any third party. In maintaining the

Page 1 of 3

EXHIBIT _A_
PAGE _1_ OF _3_

confidentiality of CONFIDENTIAL INFORMATION disclosed hereunder, the, RECIPIENT shall employ reasonable procedures not less restrictive than the procedures ordinarily used by that party to protect its own personal confidential information.

4. RECIPIENT agrees that the CONFIDENTIAL INFORMATION will be used solely for the purpose of conducting business and implementing the OPPORTUNITIES or ACTIVITIES described above as employee.

5. This agreement shall be effective as of the date hereof and up to 1 year after the EMPLOYEE's employment is terminated for just cause (non-performance as pertaining to THIS AGREEMENT) or leaves the company voluntarily. IN NO EVENT shall the EMPLOYEE be subject to the terms and conditions of THIS AGREEMENT due to cessation of business by AFT for any reason.

6. Upon DISCLOSER's request, RECIPIENT will promptly return to DISCLOSER all copies of all CONFIDENTIAL INFORMATION furnished to RECIPIENT or its REPRESENTATIVEs and will destroy all analyses, compilations, studies, and other material prepared by RECIPIENT or its REPRESENTATIVES based in whole or in part on such CONFIDENTIAL INFORMATION.

7. The PARTIES recognize and agree that neither the execution of this AGREEMENT nor the furnishing of CONFIDENTIAL INFORMATION by one PARTY shall be construed as granting to the other PARTY either expressly, by implication, or by otherwise any license or right under any patent, copyright, trademark, trade secret, or other intellectual property right, owned or controlled by the disclosing PARTY either presently or hereafter.

8. RECIPIENT shall deliver to DISCLOSER such certifications of compliance with the terms of this AGREEMENT as DISCLOSER may reasonably request.

9. RECIPIENT agrees that money damages would not be sufficient remedy for any breach of this AGREEMENT by it or its REPRESENTATIVES, and that, in addition to all other remedies, DISCLOSER shall be entitled to specific performance and injunctive relief or equitable relief, in ex parte without bond, for any such breach. RECIPIENT agrees to be RESPONSIBLE for any breach of this AGREEMENT by any of its REPRESENTATIVES hereunder. RECIPIENT agrees to REIMBURSE DISCLOSER for all costs and expenses including reasonable attorney's fees incurred by DISCLOSER in this regard, provided RECIPIENT or its REPRESENTATIVES are found to have violated this AGREEMENT by a court of competent jurisdiction.

10. No failure to delay by DISCLOSER or any of its REPRESENTATIVES in exercising any right, power or privilege under this AGREEMENT shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise of any right, power or privilege hereunder. No provision of this AGREEMENT may be waived or amended nor any consent given except in writing signed by a duly authorized representative of DISCLOSER, which specifically refers to this AGREEMENT and the provisions so amended or for which such waiver or consent is given.

11. Each PARTY represents to the other PARTY: (a) that this AGREEMENT constitutes a valid, legal, and binding obligation of the PARTY enforceable in accordance with its terms against the PARTY, its affiliates, successors, assigns, and (if applicable) partners; (b) that no governmental, regulatory, or any other consent (public or private) is required for the PARTY to perform as required hereunder; (d) that there are no proceedings of any kind threatened or pending that could (i) require the PARTY to disclose the CONFIDENTIAL INFORMATION received or the terms hereof or (ii) adversely affect the PARTY's ability to perform hereunder; and (d) that the signatory hereof on behalf of the PARTY is duly authorized to bind PARTY.

12. This AGREEMENT sets forth the entire agreement of the PARTIES with regard to the subject matter thereof and supersedes all prior agreements, discussions, and communications, if any, and shall be binding upon deter to the benefit of the successors and assigns of either PARTY hereto, including employees, officers, directors, shareholders and affiliates.

13. The validity, construction and performance of this AGREEMENT shall be governed by the laws of the State of Washington, without regard to provisions regarding conflicts of law If any provisions of this AGREEMENT are held by a court of competent jurisdiction to be invalid under any applicable statute or rule of law, they are to that extent to be deemed omitted and the remaining provisions of this AGREEMENT shall remain in full force and effect.

**IN WITNESS WHEREOF**, the PARTIES have caused this AGREEMENT to be executed by their duly authorized officers on the date first set forth above.

APPLIED FILTER TECHNOLOGY, INC.     JEFFREY WETZEL

By: Paul Tower     By: _JEFFREY V. WETZEL_

Name: _Paul Tower_     Name: _[signature]_

Title: _____     Title: _TECHNICAL DIRECTOR_

"FIRST PARTY"     "SECOND PARTY"